CITY OF OSCEOLA et al., Appellees, v. MIDDLE STATES UTILITIES COMPANY, Defendant, Appellant; W. E. HAHN, Defendant.

No. 42193.

NOVEMBER 20, 1934.

REHEARING DENIED APRIL 5, 1935.

Hughes, O'Brien & Faville, and Donnelly, Lynch, Anderson & Lynch, for appellant.

O. M. Slaymaker and R. E. Killmar, for appellees.

ALBERT, J.—Prior to October 1, 1897, the Iowa Telephone Company installed and operated a local and long distance telephone system in and through the city of Osceola, Iowa. The Clearfield &

Mt. Ayr Telephone Company built a long distance line through said city in November, 1897. The Southern Iowa Telephone Company, as successor to the Clearfield & Mt. Ayr Company, put in operation a local exchange in said city in 1901. In March, 1913, the city, by proper ordinance and an election, granted a franchise to Ayres-Emary-Gibson to operate a local telephone exchange in Osceola. The franchise thus acquired was transferred to the Clarke County Mutual Telephone Company, which put in such local exchange. In December, 1920, the Iowa Telephone Company changed its name to the Northwestern Bell Telephone Company. Through a series of transfers, the dates of which are not material here, all the rights of all these companies eventually (in March, 1929) were transferred to the Middle States Utilities Company of Iowa. On September 1, 1929, the Middle States Utilities Company raised the rates charged for telephone service in said city to $3.75 for an individual wall business telephone and $2.25 for an individual wall residence telephone, per month. A 25-cent reduction was allowed if paid by the 10th of the month. In October, 1929, the petition in this action was filed in the district court of Clarke county, Iowa.

On the 5th day of April, 1897, the said city of Osceola passed two ordinances alleged to grant franchises, one to the Iowa Telephone Company and one to the Clearfield & Mt. Ayr Telephone Company for the establishment of local exchanges in said city. As will be later shown, neither of these transactions had any validity because of the lack of power on the part of the city to grant the same.

The first question raised by the appellant is bottomed on the following conceded facts: That the telephone company, "an Iowa corporation," constructed a long distance telephone system through the town of Osceola and put in operation a local system prior to October 1, 1897, and it is the claim of the present holder of the rights of the Iowa Telephone Company that it thereby acquired a perpetual franchise to operate such local and long distance system in said town of Osceola.

This gives rise to a question that has on several occasions been before this court. The right to grant such franchises is a part of the sovereignty of the state, and prior to the date on which the Code of 1897 went into operation, that power rested with the legislature. In pursuance thereof, the legislature enacted section 1324 of the Code of 1873, and following the same the General Assembly enacted chapter 104 of the Acts of the Nineteenth General Assembly. The

material part of the aforesaid section 1324 of the Code of 1873 reads as follows:

"Any person or company may construct a telegraph line along the public highways of this state, or across the rivers or over any lands belonging to the state or to any private individual, and may erect the necessary fixtures therefor."

The amendment made to said section by the aforesaid Nineteenth General Assembly was to insert after the word "telegraph" in the first line thereof the words "or telephone". The purpose of this amendment was to extend to telephone companies the same rights as were given to the telegraph companies in the aforesaid section 1324. This court has held that a telephone company which constructed its lines, either long distance or local or both, in a city or town, under the aforesaid amended section, thereby acquired a perpetual franchise for the use and occupation of the streets and alleys of such town, subject to the reserved rights of the state. This is the conclusion reached in our cases as follows: Chamberlain v. Iowa Telephone Co., 119 Iowa 619, 93 N. W. 596; State v. Nebraska Telephone Co., 127 Iowa 194, 103 N. W. 120; State v. Chariton Telephone Co., 173 Iowa 497, 155 N. W. 968; State v. Iowa Telephone Co., 175 Iowa 607, 154 N. W. 678, Ann. Cas. 1917E, 539.

It is undisputed in the record that prior to the taking effect of the Code of 1897 on the 1st of October, the Iowa Telephone Company had constructed a toll line system and a local telephone system in the city of Osceola, and that it was occupying the streets and alleys of said town, and had some fifty-five local telephones in operation in said town, connected with said system. It follows of necessity, therefore, that the rights of the Iowa Telephone Company to so conduct said system and occupy the streets and alleys of said town were perpetual, under our prior holdings. The city answers this proposition by asserting that, while this might be true as an original proposition, whatever rights the company had were lost by abandonment and nonuser.

To a fair understanding of this contention on the part of the city some further statements from the record must be made. First, as to the two ordinances referred to, one granting a franchise to the Iowa Telephone Company and the other to the Clearfield & Mt. Ayr Company, it is to be said that at the time they were passed (in April, 1897) the city had no authority whatever to pass such

ordinances and no election was ever held to ratify the same, which, of course, could not add validity under the law as it then existed; and, further, they expired on the 5th day of April, 1922, so they have no bearing on any of the questions involved herein.

What is known in the record as the Ayres-Emary-Gibson ordinance was passed in March, 1913, was a regular ordinance followed by an election, and granted a franchise to operate a local telephone exchange in Osceola. Among other provisions contained therein was a provision that the grantees or their assigns shall not "charge in excess of the following rates, which shall be collected not oftener than monthly: * * * For the use of such telephone * * * the sum of $1.00 per month * * *. For the use of telephones in business houses, offices or places other than dwellings, a sum not to exceed $1.50 per month;" and it is the claim of the appellees that the telephone company has no right to increase its charges in excess of those above specified, and therefore that the appellees were entitled to the injunctive relief granted by the lower court.

That there may be such a thing as an abandonment of a franchise is held and discussed in the following cases: New Jersey, Given, Prosecutor v. Wright, 117 U. S. 648, 6 S. Ct. 907, 29 L. Ed. 1021; Thompson v. Schenectady R. Co. (C. C.) 124 F. 274; New York Elec. Lines Co. v. Empire City Subway Co., 235 U. S. 179, 35 S. Ct. 72, 59 L. Ed. 184; Todd v. Citizens Gas Co. of Indianapolis (C. C. A.) 46 F. (2d) 855; Wright v. Milwaukee Elec. Ry. & Light Co., 95 Wis. 29, 69 N. W. 791, 36 L. R. A. 47, 60 Am. St. Rep. 74; while in some of the states it is held that this doctrine of abandonment does not apply where the granting power has not given its consent. 12 R. C. L. p. 204, section 28. But, as a fundamental doctrine in all cases that have been brought to our attention, one of the necessary elements to constitute an abandonment is an intention to abandon; nonuser is not sufficient. See State v. Twin Village Water Co., 98 Me. 214, 56 A. 763; Wright v. Milwaukee Electric Ry. & Light Co., 95 Wis. 29, 69 N. W. 791, 36 L. R. A. 47, 60 Am. St. Rep. 74; Bergen Turnpike Co. v. North Bergen Tp., 95 N. J. Law 369, 111 A. 686; 26 C. J., p. 1042.

For the moment, therefore, we turn to the record to determine whether or not there is any evidence to show such intention. The record shows that after the Iowa Telephone Company had established its long distance and local exchange in said city the Clearfield

& Mt. Ayr Telephone Company had come into the field, and shortly thereafter the Iowa Company lost all its local patronage, along about the year 1902, and for several years thereafter had no local telephones in said city except in four business houses which were connected with the switchboard for long distance or toll business. So far as the record is concerned, the poles and wires of the Iowa Telephone Company continued to occupy the same position in the streets and alleys of said city during all of said time; at least, there is no showing in the record that they were ever changed or removed. The Iowa Telephone Company still maintained its switchboard, took care of its toll business, and maintained the usual operators at its office for said purposes. If any conclusion is to be drawn from the record, it is that the Iowa Telephone Company was still exercising its rights under its perpetual franchise and was there ready to do a local business, but the other company had taken away all its patrons. This, in our opinion, is not a sufficient record to sustain the element of intention. In other words, the record is barren of sufficient evidence showing an intention on the part of the Iowa Telephone Company to abandon its rights under the legislative franchise. But, it is insisted that the acts and conduct of the Iowa Telephone Company and its successors was to exercise the rights they acquired under the Ayres-Emary-Gibson ordinance and they are therefore bound by the terms thereof and hence have no right to increase the charges. While it is true that the company claims some right under the Ayres-Emary-Gibson franchise, they primarily bottom their right on that of a perpetual franchise, which we have held they had.

In the case of Town of Golconda v. Field, 108 Ill. 419, a similar contention was made. In that case a ferry was established in 1823, which was confirmed by an act of the legislature in 1827, and the same had been used ever since for more than fifty-six years. Later, in 1859, John Field, the owner of the ferry franchise, obtained at a general session of the legislature the passage of a special law authorizing him and his heirs and assigns to establish and keep a ferry across the Ohio river between Golconda and the opposite Kentucky shore for a term of twenty years. After the expiration of said twenty years, the county board of Pope county issued a license to operate a ferry across the Ohio river between the town of Golconda and the opposite shore in the state of Kentucky, which license was by deed sold and conveyed to the town of Golconda. This same ferry right was granted to Frank Jahn. It was observed in that case that

Field, having recognized the act of 1859 and acted under it, " * * * he and the other complainants are estopped from claiming any rights other than those granted by that act of the legislature. The doctrine of estoppel is not applicable to a question of this character. * * * The complainants, when the act of 1859 was passed, were in the possession of the ferry franchise which had been conferred originally on Daniel Field, and descended to them. They had an undoubted right to hold and operate the ferry under the original grant. They did no act indicating an intention to abandon title to the ferry, but when the act of 1859 was passed they accepted its provisions, and held under it in connection with the original title. We do not think they waived any rights held under the original grant by accepting the provisions of the act of 1859, nor were they estopped from claiming under the original grant. If they thought the act of 1859 might strengthen their title to the ferry, we perceive no reason which would preclude them from accepting its provisions and at the same time retain the original title held by them when the act of 1859 was passed."

This doctrine is announced in the case of Willis v. Calhoun, 145 Ky. 95, 140 S. W. 199.

In the case of State v. Chariton Telephone Co., 173 Iowa 497, 155 N. W. 968, 970, the situation was this: Prior to the enactment of the Act of 1897, to wit, in 1894, the city of Chariton passed an ordinance granting the defendant the right to erect and maintain and use poles in the streets of Chariton for telephone purposes, for a period of fifteen years, which expired in 1909. Pursuant thereto the company did construct a telephone exchange within said city and upon its streets and alleys, and continued to operate the same, and has occupied said streets and alleys with said poles ever since. It was decided in effect that the telephone company had a legislative franchise. We there said:

"It is so fundamental as not to require the citation of authority that a municipality has no power except as expressly granted by the legislature, or such as is necessarily to be inferred from the power granted. It had no power to grant the telephone company a charter in the year 1894, and its act in so doing was *ultra vires* and void. The acceptance of the ordinance by the company did not estop it from claiming under a valid legislative grant by the state; and, even if the act be treated as a license to the defendant to use its streets, all terms of that license have been complied with, and neither

party is claiming anything directly thereunder. The same point was involved in Chamberlain v. Iowa Telephone Co., 119 Iowa 619, 93 N. W. 596, and it was there disregarded as inconsequential."

Such is the holding in the case of Burroughs v. City of Cherokee, 134 Iowa 429, 109 N. W. 876.

Having reached the conclusion that the appellant, as successor to the Iowa Telephone Company, holds a franchise granted directly by the legislature itself, a further question arises as to whether or not the municipality, as against this perpetual franchise of the appellant, has any right to fix the rates or charges to be made thereunder. The power of a municipality has been quite exhaustively discussed in the case of Van Eaton v. Town of Sidney, 211 Iowa 986, 231 N. W. 475, 476, 71 A. L. R. 820. We there summarized the rule as follows:

"A municipality is wholly a creature of the legislature, and possesses only such powers as are conferred upon it by the legislature; that is, (1) such powers as are granted in express words; or (2) those necessarily or fairly implied in or incident to the powers expressly conferred; or (3) those necessarily essential to the identical objects and purposes of the corporation as by statute provided, and not those which are simply convenient."

Under the rule there laid down we have sought in the statutes in vain for anything that would confer upon the municipality, under the circumstances of this case, the right on its part to fix the rates. While as to most, if not all, of the other public utilities, powers are conferred upon the municipalities under certain circumstances to fix rates, there is no provision as to telephone companies. The power of rate-making rests primarily in the state and remains with it at least until it confers such power upon the municipality. Iowa Telephone Co. v. City of Keokuk (D. C.) 226 F. 82. The legislature not having conferred such power upon it, the municipality had no right to attempt to exercise such power.

The municipality being without power to fix the rates, it follows that it would have no power to contract as to rates. This seems to be the general rule. See City of Winchester v. Winchester Waterworks Co., 251 U. S. 192, 40 S. Ct. 123, 64 L. Ed. 221; Iowa Telephone Company v. Keokuk (D. C.) 226 F. 82; Ottumwa Ry. & Light Co. v. Ottumwa, 173 N. W. 270 (opinion later withdrawn); Knoxville Gas. Co. v. Knoxville (C. C. A.) 261 F. 283; Home Tele-

phone & Telegraph Co. v. Los Angeles, 211 U. S. 265, 29 S. Ct. 50, 53 L. Ed. 176; Mills v. City of Chicago (C. C.) 127 F. 731; San Antonio v. San Antonio Public Service Company, 255 U. S. 547, 41 S. Ct. 428, 65 L. Ed. 777; Railroad Commission v. Los Angeles Ry. Corp., 280 U. S. 145, 50 S. Ct. 71, 74 L. Ed. 234; 19 R. C. L., p. 859, section 161.

Appellees cite cases from other jurisdictions holding that the provisions of the franchise may cover and amount to a contract as to rates, and that the company is bound by such provisions; but in each instance where such holding is made, statutory power was conferred by the municipality either to fix rates or authorizing the making of such contract. We say, therefore, that if we should hold that the Ayres-Emary-Gibson franchise was to be considered as bearing on the case, the same would not be enforceable in so far as the rates therein fixed were concerned, because the municipality had no power to make such contract. We therefore hold that the appellant is the possessor of a legislative franchise which is perpetual, subject, of course, to any reserved power in the state, and that the appellees were not entitled to specific performance as asked in the enforcement of the rates provided in the Ayres-Emary-Gibson franchise, and that the equities in the case are with the appellant. Having reached this conclusion, the necessity of deciding the question of whether or not the rates proposed are reasonable is not before us for consideration, and therefore we express no opinion thereon.—Reversed.

MITCHELL, C. J., and STEVENS, CLAUSSEN, ANDERSON, and DONEGAN, JJ., concur.

KINDIG, J. (dissenting)—I dissent on the theory that the contract for rates is valid until the legislature exercises its right to fix rates through a commission, a board, or otherwise. The rate-making power is a police power vested in the legislature, but the parties may fix rates by contract until such time as the legislature exercises its fundamental right.